IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 23-2543

KAYLA SMILEY,

Plaintiff/Appellant,

v.

DR. KATIE JENNER, *in her official capacity,*

Defendant/Appellee.

_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:23-cv-1001-JPH-MKK
The Honorable James P. Hanlon, Judge

**BRIEF AND SHORT APPENDIX OF APPELLANT**
_____

Stevie J. Pactor
*Counsel of Record*
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105

Attorneys for Appellant

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2543

Short Caption: Kayla Smiley v. Katie Jenner

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kayla Smiley

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Kenneth J. Falk    Date: 8/10/2023

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

<u>/s/ Kenneth J. Falk</u>
 Kenneth J. Falk
Attorney at Law

**Save As**    **Clear Form**

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2543

Short Caption: Kayla Smiley v. Katie Jenner

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kayla Smiley

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Gavin M. Rose      Date: 8/10/2023

Attorney's Printed Name: Gavin M. Rose

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317-635-4059      Fax Number: 317-635-4105

E-Mail Address: grose@aclu-in.org

rev. 12/19 AK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

<u>/s/ Gavin M. Rose</u>
Gavin M. Rose
Attorney at Law

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2543

Short Caption: Kayla Smiley v. Katie Jenner

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kayla Smiley

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)      If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Stevie Pactor      Date: 8/10/2023

Attorney's Printed Name:  Stevie Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address:  1031 E. Washington St.

Indianapolis, IN 46202

Phone Number:  317-635-4059      Fax Number:  317-635-4105

E-Mail Address: spactor@aclu-in.org

rev. 12/19 AK

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

<u>/s/ Stevie J. Pactor</u>
Stevie J. Pactor
Attorney at Law

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iv

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUES ............................................................................ 1

STATEMENT OF THE CASE ............................................................................... 3

    I.   Indiana Code § 20-30-17.......................................................................... 3

    II.  The impact of the statute on plaintiff-appellant Kayla Smiley................... 3

    III.    Ms. Smiley is reasonably required to change her behavior to avoid violating the statute and risk the loss of her teaching license................................................. 8

    IV.    Procedural history .............................................................................. 9

SUMMARY OF THE ARGUMENT ..................................................................... 11

STANDARD OF REVIEW ................................................................................... 14

ARGUMENT ....................................................................................................... 15

    I.   Ms. Smiley is likely to succeed on her claim that Indiana Code § 20-30-17-2 is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment ............................................................................................... 15

        A.  A statute is void-for-vagueness if it lacks a discernible core of meaning and fails to provide standards that would govern its enforcement ........................................... 15

        B.  The statute lacks a discernible core because the meaning of statutory term "instruction" cannot be determined.............................................................. 17

        C.  The statute lacks a discernible core because the term "human sexuality" is subject to a wide array of definition.................................................................... 20

    II.  Ms. Smiley is likely to succeed in her claim that the statute violates the First Amendment ............................................................................................... 24

        A.  A law violates the First Amendment if it is impermissibly vague and overbroad ..................................................................................................................24

        B.  The statute chills a substantial amount of Ms. Smiley's protected speech ......... 25

        C.  The statute's chilling effect is unreasonable ............................................ 30

    III.    The other requirements for the grant of a preliminary injunction are met ........ 32

        A.  Ms. Smiley is faced with irreparable harm for which there is no adequate remedy at law................................................................................................... 32

        B.  The balance of harms favors Ms. Smiley .................................................. 33

C.  The public interest will not be disserved by the grant of a preliminary injunction ...................................................................................................33

CONCLUSION ........................................................................................................ 34

CERTIFICATE OF COMPLIANCE ....................................................................... 35

CERTIFICATE OF SERVICE ................................................................................ 36

SHORT APPENDIX..............................................................................App. 1

STATEMENT OF COMPLIANCE WITH CIRCUIT RULE 30(d).....................App. 16

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ................... 14

*Baer v. City of Wauwatosa*, 716 F.2d 1117 (7th Cir. 1983) ........................................... 16

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ............................................................... 24

*Berg v. Health & Hosp. Corp. of Marion Cnty., Ind.*, 865 F.2d 797 (7th Cir. 1989) .. 31

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ...................... 24, 26, 29

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ..................................... 33

*Cntr. For Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ................... 25

*Connick v. Myers*, 461 U.S. 138 (1983) ......................................................................... 31

*Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612 (2d Cir. 2011) 23

*Dubin v. United States*, 599 U.S.--, 2023 WL 3872518 (June 8, 2023) ........................ 24

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................................. 33

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................................ 24

*Fine Foods, Inc. v. U.S. Dep't of Agric.*, 274 F.3d 1137 (7th Cir. 2001) ...................... 32

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .................................................................... 30

*Hegwood v. City of Eau Claire*, 676 F.3d 600 (7th Cir. 2012) ................................ 11, 15

*Helvering v. Horst*, 311 U.S. 112 (1940) ....................................................................... 19

*Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67 (Ill. Ct. App.), *appeal dismissed*, 2021 WL 9680879 (Ill. Dec. 20, 2021) ................................................... 21

*Hynes v. Mayor of Oradell,* 425 U.S. 610 (1976) ......................................................... 24

*Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990 (N.D. Cal. 2015) .............. 21

*Johnson v. United States*, 576 U.S. 591 (2015) ....................................................... 16, 23

*Kennedy v. Bremerton School District*, 597 U.S. --, 142 S. Ct. 2407 (2022) ......... passim

*Kolender v. Lawson*, 461 U.S. 352 (1983) ..................................................................... 15

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) ................................................................. 15

*Lazy Y. Ranch, Ltd. v. Wiggins*, 2007 WL 1381805 (D. Idaho Mar. 13, 2007), a*ff'd*, 546 F.3d 580 (9th Cir. 2008) ......................................................................................... 22

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*, 2023 WL 171392 (D.N.H. Jan 12, 2023) ............................................................................................................................. 19, 29

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 U.S. 477 (7th Cir. 2007) ..................... 26

*Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir. 2011) ................. 25

*NAACP v. Button*, 371 U.S. 415 (1963) ......................................................................... 24

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002) ..... 33

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ........................................... 15

*Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563 (1968) .................................................................... 30, 31, 32

*Planned Parenthood of Ind. & Ky. v. Marion Cnty. Prosecutor*, 7 F.4th 594 (7th Cir. 2021) ............................................................................................................... 16, 22

*Pontiac School District v. Pontiac Education Ass'n*, 811 N.W.2d 64 (Mich. Ct. App. 2012) ............................................................................................................................ 19

*Rankin v. McPherson*, 483 U.S. 378 (1987) ................................................................ 26

*Robinson v. State*, 56 N.E.3d 652 (Ind. Ct. App. 2016) .............................................. 7

*Sessions v. Dimaya*, 584 U.S. --, 138 S. Ct. 1204 (2018) ......................................... 16

*Sherman ex rel. Sherman v. Koch*, 623 F.3d 501 (7th Cir. 2010) ............................. 15

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................................... 31

*Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) ............................................. 13, 30

*Texas v. EEOC*, 2022 WL 4835346 (N.D. Tex. Oct. 1, 2022) .................................. 21

*Tinker v. Des Moines Independent School Dist.*, 393 U.S. 503 (1969) ...................... 25

*United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120 (7th Cir. 1984) ............... 15

*United States v. Davis*, 588 U.S. --, 139 S. Ct. 2319 (2019) .............................. 16, 24

*United States v. Nagelvoort*, 856 F.3d 1117 (7th Cir. 2017) ............................... 11, 15

*United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) .......... 14, 30, 31

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................... 24

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................. 15

*Wernsing v. Thompson*, 423 F.3d at 732 (7th Cir. 2005) .......................................... 30

*Whole Woman's Health Alliance v. Hill*, 937 F.3d 864 (7th Cir. 2019) ..................... 34

*Youdon v. Bd. of Immigration Appeals*, 204 Fed. App'x 89 (2d Cir. 2006) ............... 22

**Statutes**

28 U.S.C. § 1292(a)(1) ......................................................................................... 1, 16

28 U.S.C. § 1331 ...................................................................................................... 1

Ind. Code § 20-18-2-3 .............................................................................................. 8

Ind. Code § 20-18-2-3.5 ......................................................................................... 18

Ind. Code § 20-19-1-1.1(e) ....................................................................................... 8

Ind. Code § 20-24.5-2 ............................................................................................... 3

Ind. Code § 20-25.7-4-3(b) ..................................................................................... 18

Ind. Code § 20-25-12-8(b) ...................................................................................... 18

Ind. Code § 20-26-11-11(a) ..................................................................................... 18

Ind. Code § 20-26-7.1-4.5(b) .................................................................................. 18

Ind. Code § 20-28-5-26(a) ...................................................................................... 18

Ind. Code § 20-29-2-4 ............................................................................................ 18

Ind. Code § 20-29-2-11 ........................................................................................... 18

Ind. Code § 20-30-17-1 .................................................................................... 1, 3, 8

Ind. Code § 20-30-17-2 ................................................................................... passim

Ind. Code § 20-35-11-4 ........................................................................................... 18

Ind. Code § 20-35-1-8 ............................................................................................ 18

**Other Authorities**

Esha Penharkar, Education Week, *The Top 7 Most Banned Picture Books Last Year*, Feb. 22, 2023.................................................................................................... 21

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction of this case pursuant to 28 U.S.C. § 1331. Federal question jurisdiction was based on alleged violations by the defendant of both the First and Fourteenth Amendments to the United States Constitution.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1292(a)(1) as it is an appeal from the district court's denial of plaintiff's motion for a preliminary injunction. The denial occurred on July 28, 2023, and the merits of plaintiff's case remain to be resolved by the district court. The Notice of Appeal was filed on August 8, 2023. This is not an appeal from a decision of a magistrate judge. Dr. Katie Jenner, sued in her official capacity, remains the current Indiana Secretary of Education.

## STATEMENT OF THE ISSUES

Section 3 of Indiana House Enrolled Act ("H.E.A.") 1608, codified as Indiana Code § 20-30-17-1, *et seq.*, prohibits schools, their employees, staff, or third-party vendors from "provid[ing] any instruction to a student in prekindergarten through grade 3 on human sexuality." Ind. Code § 20-30-17-2 (eff. July 1, 2023). Violation of the statute can lead to a teacher's license being suspended or revoked.

But the statute does not define the terms "instruction" or "human sexuality," and plaintiff-appellant Kayla Smiley, who teaches a combined class of first through third-grade students, has no idea what those statutory terms mean. The statute itself provides no standards that would guide a teacher in conforming her actions to the requirements of the law. Similarly, the Indiana Department of Education has not provided any standards to establish whether a teacher has engaged in forbidden "instruction" on the subject of "human sexuality." This vagueness is particularly

problematic as the undefined term "instruction" can only reasonably be understood to apply to Ms. Smiley's speech apart from classroom lessons to which she has a First Amendment right to free expression. The statute's chilling effect is both intentional and apparent.

The questions presented for review are:

1.     Whether the district court erred in holding that the statute had a "discernible core" and an "ascertainable" enforcement standard, insofar as it applies to prohibit the teaching of sex education or about sexually transmitted diseases in prekindergarten through third grades, and therefore is not void in violation of the Due Process Clause of the Fourteenth Amendment.

2.     Whether the district court erred in concluding that:

   a.    "most if not all" of the speech activities in which Ms. Smiley desires to engage are actually the speech activities of her employer, and therefore not subject to First Amendment protection;

   b.    to the extent that any protected speech activities are implicated, the statute does not operate against a "substantial" amount of protected speech; and

   c.    the statute is therefore not overbroad in violation of the First Amendment.

3.     Whether the remaining requirements for the grant of a preliminary injunction are met so that one should be issued in favor of Ms. Smiley.

## STATEMENT OF THE CASE

I.     Indiana Code § 20-30-17

Indiana Code § 20-30-17-2, which took effect on July 1, 2023, prohibits "[a] school, an employee or staff member of a school, or a third party vendor used by a school to provide instruction" from "provid[ing] any instruction to a student in prekindergarten through grade 3 on human sexuality." The term "school" is defined to include any public school, laboratory schools established under Indiana Code § 20-24.5-2, the Indiana School for the Deaf, and the School for the Blind and Visually Impaired. Ind. Code § 20-30-17-1.

Although the law focuses on "instruction" and "human sexuality," neither term is defined in the statute, elsewhere in Indiana law, or in Indiana regulations.

II.    The impact of the statute on plaintiff-appellant Kayla Smiley

Kayla Smiley is a teacher, licensed by the State of Indiana, who is currently employed by Indianapolis Public Schools ("IPS"). (District Court Docket ["Dkt."] 20-1 at 1 ¶¶ 2-4). During the present 2023/2024 school year, she teaches a combined class of first through third graders in IPS School 51. (*Id.* ¶ 5). She intends to continue teaching these grade levels. (*Id.*).

Ms. Smiley is aware that Indiana Code § 20-30-17-2 prohibits her from providing her students with "instruction" on "human sexuality," but she does not know what these statutory terms mean, and she has received no guidance from the Secretary of Education or the Indiana Department of Education as to their meaning. (*Id.* at 2 ¶¶ 8-9, 9 ¶ 42). In fact, no regulations have been promulgated to give this guidance, and none are planned. (Dkt. 26-2 at 6 ¶ 20).

In Ms. Smiley's experience, elementary school students are curious about the world, and it is common for everyday activities, including students' experiences at home or the books that they have read, to prompt discussions that could be deemed to involve "human sexuality." (Dkt. 26-1 at 2 ¶ 11). For example, students may have siblings enter their families, which will naturally and inevitably lead to discussions as to "where babies come from." (*Id.* ¶ 12). In another instance, Ms. Smiley's students had a conversation about family structure and gender roles prompted by one student's statement that they have two dads and no mom. (Dkt. 26-1 at 39-40 [Smiley Dep. at 148:8-150:1]). She has no idea how she is to handle this discussion without touching on what may be deemed to be "human sexuality." (Dkt. 20-1 at 2 ¶ 13).

Ms. Smiley strives to help her students develop reading skills in the early grade levels that she teaches, as reading is an essential building block for further learning. (*Id.* ¶ 14). She maintains a classroom library that contains age-appropriate books on numerous subjects, as she wants to provide materials that appeal to the students' interests to the greatest extent possible. (*Id.* at 3 ¶ 16). The books will be read by students in group or independent reading time and will naturally prompt discussions by the students. (*Id.* at 4 ¶ 22).

Some of the books touch on LGBTQ themes. (*Id.* at 3 ¶ 17). For instance, she has age-appropriate biographies of Elton John and Harvey Milk, among other biographies. (*Id.*). The Elton John book mentions that he is married to a man and discusses his friendship with Ryan White and the foundation that Ryan White created to help fight AIDS. (*Id.* at 3 ¶ 18). The Harvey Milk biography mentions Mr.

[4]

Milk's fight for gay rights. (*Id.* ¶ 19). The book *Jack not Jackie,* is about a child named Jackie who transitions and now identifies as Jack. (Dkt. 26-1 at 22 [Smiley Dep. at 80:13-20]). Ms. Smiley's classroom library also includes books that discuss and represent different family relationships and structures. (Dkt. 20-1 at 3 ¶ 20). For example, she has in her classroom library the book *And Tango Makes Three*, which is the true story of two male penguins who raised a chick together at the Central Park Zoo in New York City. (*Id.*). The library also contains *My Maddy*, which concerns a non-binary person who is not referred to as "my mom" or "my dad," but just "my Maddy." (Dkt. 26-1 at 23-24 [Smiley Dep. at 84:23-84:5]). And her classroom library includes *Sleeping Beauty*, which, of course, ends with a prince kissing a sleeping girl. (*Id.* at 25 [Smiley Dep. at 89:19-24]).

Some of the books in her library therefore touch on such topics as parenting, AIDS, gender identity, and same-sex relationships. (Dkt. 20-1 at 4 ¶ 21). Ms. Smiley is uncertain whether inclusion of these books in her classroom library qualifies as "instruction . . . on human sexuality." (*Id.*). If students, for example, want to discuss with her the fact that two male penguins raised a chick together as a family, she does not know if this is allowed by the statute. (*Id.*).

But Ms. Smiley's concerns about the statute are not confined to just the books in her classroom. (*Id.* at 4 ¶ 23 – 8 ¶ 39). She believes that part of her role as an educator is to guide students so that they understand how to behave appropriately and responsibly. (*Id.* at 4 ¶ 23). This frequently requires her to explain and discuss why something is inappropriate, rather than just redirecting a student. (*Id.*). In the

[5]

past, her students have, for example, said that someone or something is "gay"—intending this as an insulting term. (*Id.* ¶ 24). She believes this is inappropriate and creates an opportunity to discuss why the term "gay" should not be used pejoratively. (*Id.*). But it is impossible to engage in this conversation without explaining what it means to be "gay," and she has no idea whether this is considered instruction on the topic of human sexuality. (*Id.* ¶ 25).

Ms. Smiley also expresses her own personal beliefs, including messages of tolerance, by placing stickers on the reusable water bottle that she keeps with her, including in class and in the halls before, during, and after school. (*Id.* at 5 ¶ 26). The messages support LGBTQ rights, with such statements as "Trans people belong here" and "Say Gay." (*Id.*). The water bottle also has a rainbow flag, which is widely recognized as the symbol of LGBTQ pride. (*Id.*). She has also had LGBTQ-supportive bumper stickers on her car, parked in the school's parking lot, and students have in the past commented on them. (*Id.*). She recently purchased a new car, and she intends to again affix bumper stickers supporting LGBTQ rights. (*Id.*). Ms. Smiley is uncertain whether she can engage in this personal expression and is uncertain what she is to do if the messages on the water bottle or car provoke a discussion in or outside of her class. (*Id.* ¶ 27).

Ms. Smiley is not alone in her uncertainty as to what is encompassed by the statutory term "human sexuality." One state senator who co-sponsored the legislation implied, during consideration of the bill, that a Berenstain Bear book featuring an anthropomorphic family of bears could involve "human sexuality." (Dkt 20-5 at 26:4-

16).[1] When asked if a kindergarten teacher could read the book to students, and indicate that the bear family has a mom, dad, and baby, she answered that "[i]t depends if they're reading it during human sexuality or reading class" (Dkt. 20-5 at 26:4-16)—an explanation that is certainly not apparent from the statute. Not surprisingly, there is no "human sexuality" curriculum or class for kindergarten through third grade students. (Dkt. 20-1 at 2 ¶ 9). The legislator indicated, however, that a teacher would be prohibited from telling her class that she was pregnant and that her belly would begin to grow, unless a student asked a specific question as to why the teacher's belly was getting larger. (Dkt. 20-5 at 24:3-24). Another co-sponsor was unable to answer whether it was permissible to have a book in the classroom concerning a mommy bunny and a daddy bunny who have a baby bunny, responding, "I haven't read that book." (*Id.* at 17:18-18:4).

The meaning of "instruction" is also not clear to Ms. Smiley—particularly when she interacts with students outside of the classroom-lesson setting or when she is not engaged in formal teaching. (Dkt. 20-1 at 6 ¶¶ 32, 34). Ms. Smiley believes that all of the interactions that she has with students, including those in the hallways, before or after school, or even in chance meetings off of school grounds, provide an opportunity for learning, growth, or education. (*Id.* at 7 ¶ 35). Therefore, she

---

[1]     Plaintiff does not contend that these and subsequently cited statements from legislators represent formal legislative history as "there is no legislative history in Indiana." *Robinson v. State*, 56 N.E.3d 652, 661 n.5 (Ind. Ct. App. 2016), *trans. denied.* They are cited to demonstrate that Ms. Smiley is not alone in reasonably expressing confusion as to the meaning of key statutory terms.

understands that the term "instruction" may include any interaction that she has with a student, wherever it occurs. (*Id.* ¶ 36).

This poses a problem for Ms. Smiley. If she carries her water bottle with its LGBTQ-supportive messages to and from her car, in the hallways, or even outside of school where she might interact with students, will this be considered "instruction"? (*Id.* ¶ 38). Similarly, she is uncertain whether the LGBTQ-supportive messages that she wishes to place on her new car, which will be parked in the school parking lot, will be considered "instruction." (*Id.* at 8 ¶ 39). And if she hears a student call someone "gay" as a pejorative term, and discusses with the student why that is not an appropriate thing to say, she does not know if she will be considered to have engaged in prohibited "instruction" on "human sexuality." (*Id.* at 7 ¶ 37).

III.    Ms. Smiley is reasonably required to change her behavior to avoid violating the statute and risk the loss of her teaching license

The Indiana Department of Education is responsible for licensing teachers. Ind. Code § 20-28-5-1. Dr. Katie Jenner is the Secretary of Education, and as such, is the chief executive officer of the Indiana Department of Education. Ind. Code §§ 20-18-2-3, 20-19-1-1.1(e). Based on her recommendations, the Department may suspend or revoke a teacher's license for immorality, misconduct in office, incompetency, or willful neglect of duty. Ind. Code § 20-28-5-7. There is nothing to prohibit such an action from being brought if a teacher is deemed to have violated Ind. Code § 20-30-17-2. (Dkt. 26-2 at 1 ¶ 3).

Ms. Smiley loves teaching and does not want to do anything to jeopardize her teaching license. (Dkt. 20-1 at 8 ¶ 41). On the other hand, she wishes to be able to

express her beliefs and opinions concerning matters of public concern, including LGBTQ rights, and to advocate for those positions when she is not teaching. (*Id.* at 6-7 ¶ 34, 8 ¶ 40). This includes sharing information in support of LGBTQ rights that may fall within the unclear definition of "human sexuality" and that may be in the presence of students in prekindergarten to third grade. (*Id.* at 6-7 ¶ 34).

Because of the risk to her license and profession if she does anything that can be construed as "instruction" concerning "human sexuality," Ms. Smiley intends to alter her behavior so she does not run afoul of the law, even though her past expressions have never disrupted the educational environment. (*Id.* at 8-9 ¶¶ 40-41). She will not carry her water bottle with her in areas where students might be present. (*Id.* at 8-9 ¶ 41). If she hears students using the word "gay" pejoratively, even outside of class, she will not attempt to engage them in a restorative conversation as to why that is inappropriate. (*Id.*). Instead, she will just tell them not to do it. (*Id.*). She may have to forego placing bumper stickers on her new car. (*Id.*). She will modify what she would otherwise say, even outside of the classroom, and change her approach to avoid possibly violating the law. (*Id.*). All of this will cause her anxiety. (*Id.* ¶¶ 40-41).

IV.   Procedural history

Ms. Smiley filed her Complaint for Injunctive and Declaratory Relief / Notice of Claim of Unconstitutionality of an Indiana Statute on June 9, 2023 (Dkt. 1), alleging that Indiana Code § 20-30-17-2 facially violates both the First and

Fourteenth Amendments to the United States Constitution. Ms. Smiley filed her Motion for Preliminary Injunction on June 16, 2023. (Dkt. 9).

Neither party requested a hearing on that motion, and the district court entered its decision on July 28, 2023 based on the parties' written submissions. (Order Denying Motion for Preliminary Injunction, Short Appendix ["S.A."] at 1-15).

The district court first considered Ms. Smiley's First Amendment claim, concluding that her speech constitutes the speech of her government employer, rather than her own private speech, and therefore that the First Amendment offers her speech no protection. (S.A. at 4-14). The district court further concluded that even if some of Ms. Smiley's speech, for example the bumper stickers on her car, were considered private speech, and therefore protected by the First Amendment, that limited speech activity was not "substantial" and any impingement did not justify enjoining the statute on its face. (S.A. at 11). The district court therefore concluded that Ms. Smiley had not shown the required likelihood of success on the merits of her First Amendment claim. (S.A. at 12).

As to her due process claim, the district court concluded that the statute contained a discernible core of meaning, at least insofar as Ms. Smiley agreed that "instruction on human sexuality" would include the formal teaching of sex education and teaching about sexually transmitted diseases. (S.A. at 13-14). The district court therefore concluded that Ms. Smiley was not sufficiently likely to succeed on the merits of a pre-enforcement, facial challenge to the statute. (S.A. at 14).

Inasmuch as the district court concluded that Ms. Smiley had not shown a likelihood of success on the merits, it did not address whether the other preliminary injunction factors were met. (S.A. at 15 n.7). This appeal followed.

## SUMMARY OF THE ARGUMENT

1.     The district court erred in concluding that Indiana Code § 20-30-17-2 satisfies the demands of the Due Process Clause of the Fourteenth Amendment. "The void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (citation omitted). "A statute is unconstitutionally vague if it (1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary discriminatory enforcement by those enforcing the statute." *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017) (internal quotation and citation omitted).

The statute fails these constitutional directives in both respects.  First, the statutory terms "instruction" and "human sexuality" lack ascertainable meaning. Although the State has contended that the term "instruction" must be understood to mean only "active teaching" to students done during class time, common usage and the statute's text foreclose such a reading. We all know that children are routinely instructed—by teachers, by parents, by television, and by many other sources—in a wide variety of different manners and in fora outside of formal in-class lessons. The portions of the Indiana Code dealing with education routinely refer to "classroom instruction," and distinguish among staff members who are tasked with teaching

[11]

roles and those who are not. But this provision, tellingly, omits the term "classroom" from the "instruction" to which it refers, and it applies to every staff member employed by a school. This broad application must mean something, and it renders impossible the narrow reading proposed by the State. And the term "human sexuality" fares no better. The State itself argues that the term—in addition to including the teaching of sex education and sexually transmitted diseases—includes such topics as "gender identity." Many of Ms. Smiley's informal interactions with students, as well as the messages contained in stickers on her water bottle and car, may be deemed to touch on issues of "human sexuality," but the bounds of this term are completely unclear. The district court erred in determining that the statute contained a "discernible core" of meaning.

The statute also fails to provide explicit standards to prevent arbitrary or discriminatory enforcement. It provides no standards to constrain the actions of the individual solely charged with enforcing teacher licensure—the Secretary of Education—and the vagueness of the statute renders it amenable to arbitrary or discriminatory enforcement.

2.    The district court likewise erred in concluding that Ms. Smiley was not likely to establish that Indiana Code § 20-30-17-2 violates the First Amendment. The district court erroneously concluded that "most if not all" of the speech activities in which Ms. Smiley desires to engage are actually the speech activities of her employer, and therefore are not subject to First Amendment protection. The remainder of its First Amendment analysis flowed from that erroneous conclusion. But this conclusion

contradicts the Supreme Court's recent analysis in *Kennedy v. Bremerton School District*, 597 U.S. --, 142 S. Ct. 2407 (2022). There, the Supreme Court cautioned that courts should not commit the error of "treating everything teachers and coaches say in the workplace as government speech subject to government control." *Id.* at 2425. Certainly Ms. Smiley speaks as a private person in any number of her interactions with students, and these are protected by the First Amendment, so long as her interests in that speech are "not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (quotation and citation omitted). Ms. Smiley's speech activities do not inhibit her employer's provision of effective and efficient public service, and they are protected.

Due to the statute, Ms. Smiley's speech is being chilled, so that she does not risk running afoul of the statutory prohibitions. She will not carry her water bottle, which is essentially a billboard expressing her personal views. She may have to forego replacing her expressive bumper stickers on her new car. She will alter the way that she communicates with students in their informal, non-lesson-based interactions, and she may be required to remove books from her classroom library. This chill is both real and substantial.

The chilling effect is also unreasonable. The type of prior restraint at issue here is the most disfavored form of speech regulation, and an additional weight is therefore added to the balance in favor of Ms. Smiley's speech. In this prior-restraint context, the State must show that the interests of both the "vast group of present and future

[13]

employees in a broad range of present and future expression," and of their potential audiences in hearing that expression, "are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *United States v. Nat'l Treasury Employees Union* ["*NTEU*"]*,* 513 U.S. 454, 468 (1995) (internal quotation omitted). The State cannot meet this burden, and the statute is unconstitutionally overbroad, in violation of the First Amendment.

Ms. Smiley is likely to succeed in her claims that the statute violates both the First and Fourteenth Amendments to the United States Constitution.

All of the other requirements for a preliminary injunction are met, and this case should be remanded to the district court with instruction that a preliminary injunction should issue.

### STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant or deny a preliminary injunction under the abuse of discretion standard." *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992) (citation omitted). However, the district court "abuses its discretion when it commits a clear error of fact or an error of law." *Id.* (citations omitted).

# ARGUMENT

I.  Ms. Smiley is likely to succeed on her claim that Indiana Code § 20-30-17-2 is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment

    A.  A statute is void-for-vagueness if it lacks a discernible core of meaning and fails to provide standards that would govern its enforcement

"Living under a rule of law entails various suppositions, one of which is that 'all persons are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)) (internal alteration omitted). "The void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (citation omitted). "A statute is unconstitutionally vague if it (1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary discriminatory enforcement by those enforcing the statute." *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017) (internal quotation and citation omitted). "The void for vagueness challenge was developed to eliminate statutes that embodied either of these dangers to due process." *United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129 (7th Cir. 1984).

While the Constitution "does not demand 'perfect clarity and precise guidance'" in legislative enactments, *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)), it does require that penal statutes define offenses "with sufficient definiteness that ordinary

people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing cases). The doctrine applies equally to statutes, like this one, that threaten licenses issued by the government. *See Jordan,* 747 F.2d at 1120 (citing cases, and noting that "[a]ll of these cases have one thing in common: a sanction, whether it be penal or a refusal to grant a license, for allegedly engaging in certain conduct proscribed by a statute"); *see also, e.g., Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123-24 (7th Cir. 1983) (applying vagueness doctrine to a licensing action).

This Court has used the term "limited" to describe facial, pre-enforcement vagueness challenges to statutes that do not implicate the First Amendment or other fundamental rights. *See Planned Parenthood of Ind. & Ky. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 605 (7th Cir. 2021). These statutes will withstand scrutiny so long as they provide a "discernible core" of prohibited conduct and establish some standards that would govern their enforcement. *Johnson v. United States*, 576 U.S. 591, 595 (2015). But this Court has also emphasized, following the Supreme Court's admonitions, that a vagueness challenge can be successful even where "there is some conduct that clearly falls within the provision's grasp." *Planned Parenthood,* 7 F.4th at 604 (citing *Johnson*, 576 U.S. at 602) (further citation omitted); *see also Sessions v. Dimaya*, 584 U.S. --, 138 S. Ct. 1204, 1214 (2018) (same). "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. --, 139 S. Ct. 2319, 2323 (2019).

[16]

B.     The statute lacks a discernible core because the meaning of statutory term "instruction" cannot be determined

Ms. Smiley is a teacher. She understands that even when she is not acting on behalf of her employer and standing in front of her class executing a lesson plan, many of her activities include "instruction." When she sends students to pick a book from her classroom library and they read quietly, she could be deemed to be instructing. The same is true when she carries her water bottle with stickers, or when she calms students in the lunchroom or on the playground and explains to them what the word "gay" means and why it should never be used an epithet. When she walks from her car and answers a question as to the meaning of her bumper stickers, she could be deemed to be instructing.  But are those activities "instruction" within the undefined and unclear meaning of Indiana Code § 20-30-17-2?

The State offered below a definition of "instruction" far different than what Ms. Smiley, and undoubtedly many teachers and parents, understand the term to mean. The State contended that based upon the provision's text, its context, and canons of interpretation, the term "instruction" must be understood to mean only "active teaching" to students done during class time. (Dkt. 27 at 15; *see also id.* at 10-16). The State's position was that, obviously, "instruction" does not include informal interactions with students outside of the classroom, stickers on a water bottle, or a book in a classroom library when not used as part of a "lesson plan." (Dkt. 27 at 10-16). Read in that narrow manner, argued the State, the term then has an easily ascertainable meaning.

There are numerous difficulties with the State's attempt to give clarity to this vague term. First, it makes little sense. Under the school's logic, Ms. Smiley could post a huge bulletin board covering one wall of her classroom, or could impart knowledge through writing on a whiteboard, and it would not be deemed to be "instruction" even if it focused on math or science but was not mentioned by Ms. Smiley while she engaged in "active teaching." "Instruction" obviously must mean much more than the limiting construction urged by the State.

Moreover, the plain language of the statute belies such a narrow reading. The statute applies to every school employee, regardless of whether an employee's duties include any teaching functions whatsoever. *See* Ind. Code § 20-30-17-2 (indicating that that the prohibition applies to every "school," "employee," and "staff member of a school"). The Indiana Code frequently distinguishes between "certificated employees," such as teachers, whose employment duties require them to maintain a license or permit from the division of professional standards, and non-certificated employees, whose employment requires no such licensure. *See, e.g.,* Ind. Code §§ 20-29-2-4 (regarding certificated employees), 20-29-2-11 (regarding non-certificated employees). No such distinction appears here, as this provision applies, without limitation, to *every person who works for a school*. Certainly that broad application means something, and a reasonable person would perceive it to mean that the statue applies beyond those who are engaged in "active teaching" during classroom lessons.

[18]

Moreover Title 20 of the Indiana Code is full of references to "classroom instruction,"[2] and so it would seem that the statute's use of "instruction" without the modifier must mean something different.

Common usage also confirms that the term "instruction" sweeps far more broadly than the State's narrow view. *See, e.g.*, *Helvering v. Horst*, 311 U.S. 112, 147 (1940) ("Common understanding and experience are the touchstones for the interpretation of . . . laws."). We all know that children are routinely instructed—by teachers, by parents, by television, by the internet—in a wide variety of different manners and in fora outside of formal in-class lessons. Hence the state court in *Pontiac School District v. Pontiac Education Ass'n*, 811 N.W.2d 64 (Mich. Ct. App. 2012), offered this interpretation of the term as used in a law governing collective bargaining with schools:

> The word "instruction" is defined as "the act or practice of instruction or teaching, education; knowledge or information imparted; or the act of furnishing with authoritative directions." Consequently, the term "instruction" is not ambiguous, but rather is broad in definition because it applies to "knowledge or information imparted" without placing qualifications or restrictions on the type of knowledge or information imparted.

*Id.* at 69 (internal citation omitted) (cleaned up); *see also, e.g.*, *Local 8027, AFT-N.H.*,

---

[2] *See, e.g.*, Ind. Code § 20-35-1-8 (definition of "student with a disability"); Ind. Code § 20-18-2-3.5 (definition of "dyslexia"); Ind. Code § 20-25-12-8(b) (permissible uses of excess education funds); Ind. Code § 20-26-7.1-4.5(b) (duty to maintain vacant school building); Ind. Code § 20-28-5-26(a) (training on trauma response); Ind. Code § 20-25.7-4-3(b) (establishment of innovation network school); Ind. Code § 20-35-11-4 (duties of center for deaf and hard of hearing education); Ind. Code § 20-26-11-11(a) (tuition for "emotionally disturbed children"); Ind. Code § 20-33-2-19(e) (attendance of public school children at school for religious instruction); Ind. Code § 20-28-5-12.5(a) (requirements to receive alternative certification teaching license).

*AFL-CIO v. Edelblut*, -- F. Supp. 3d --, 2023 WL 171392, at *6-7 (D.N.H. Jan 12, 2023) (statute prohibiting employer from "teach[ing], advocat[ing], instruct[ing], or train[ing]" can "be read to cover interactions with pupils outside the classroom and even beyond the school grounds"). Certainly this would explain why the statute so broadly applies to the wide swath of individuals regulated: not only those with teaching licenses are engaged in instruction.

The district court appeared to implicitly acknowledge the broad construction of "instruction" by concluding that to the extent that Ms. Smiley was involved in any "teachable moment" she was acting as a teacher, *i.e.* engaging in "instruction." (S.A. at 8-9). The chasm between "active" teaching in the classroom and any "teachable moment," no matter where and when it occurs, exposes the term "instruction" for what it is, a vague term without meaning.

C.    The statute lacks a discernible core because the term "human sexuality" is subject to a wide array of definition

Ms. Smiley's classroom library exposes her students to such issues as gay rights, transgender youth, "non-traditional" families, gender diverse persons, and even a prince kissing a sleeping girl. Her water bottle also espouses gay and transgender rights and instructs persons to "Say gay." She tackles in her classroom discussions on families headed by same-sex partners. She instructs students on the meaning of "gay" as she teaches them not to use the term pejoratively. Is she crossing the line by exposing her students to "human sexuality"? It is impossible to tell, as the term "human sexuality" is no less vague—and is perhaps even more so—than the term "instruction."

Although the State initially argued below that the statute must be read such that "human sexuality" is merely equivalent to sex education, it later indicated that "human sexuality" also includes topics such as gender identity. (Dkt. 27 at 26-27). The State cited an example from Maine, in which a teacher "explained gender identity to kindergartners by saying that sometimes doctors make a mistake when they tell parents whether their newborns are boys or girls." (Dkt. 27 at 26 [internal quotation and citation omitted]). No one would think that this was "sex education," yet the State—responsible for enforcing the challenged statute—appears to believe that it fits within the vague concept of "human sexuality." According to the State, Indiana's statute "prevents schools and teachers from giving that kind of instruction to children in prekindergarten through third grade classes." (*Id.* at 27). This alone demonstrates the breadth of meaning—or the shifting meanings—that may be attributed to the term "human sexuality" and its attendant vagueness.

A quick survey of case law also demonstrates that the term "human sexuality" is an expansive term with many meanings. For example, one court has noted that "human sexuality correlates to myriad attractions, identification, actions, and relationships." *Texas v. EEOC*, 2022 WL 4835346, at *3 (N.D. Tex. Oct. 1, 2022). Another, in allowing a plaintiff to proceed by anonymous name, noted that the case "falls into what may be roughly called the area of human sexuality," and then cited to cases concerning abortion, sexual orientation, and sexual abuse, among others, as illustrating "human sexuality." *Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990, 994 (N.D. Cal. 2015). A third case, interpreting a state human rights act, notes

[21]

that "the [statute's] definition of 'sexual orientation' encompasses several aspects of human sexuality, including 'gender-related identity.'" *Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 78 (Ill. Ct. App.), *appeal dismissed*, 2021 WL 9680879 (Ill. Dec. 20, 2021).

The books in Ms. Smiley's library[3], her informal conversations with students, the stickers on her water bottle, and the bumper stickers on her car all involve what can be easily understood as "human sexuality." Indeed, below, the State appeared to concede this in indicating that issues of gender identity are encompassed within the statutory prohibition. If Ms. Smiley is prohibited from discussing the concept of gender, how could the statute possibly permit her to discuss why a student might have two dads and no mom, to explain what it means to be LGBTQ, or to describe why pejoratively using the word "gay" is inappropriate?

The district court's analysis as to this was concise, concluding that because Ms. Smiley agreed that the statute would prohibit "formal teaching on sex education or sexually transmitted diseases," those "clear-cut cases are therefore a core of easily

---

[3]     Education Week notes that two of the books in Ms. Smiley's library, *Pride: The Story of Harvey Milk and the Rainbow Flag* and *Tango Makes Three* are among the top seven banned books in the United State in the 2022-2023 school year. Esha Penharkar, Education Week, *The Top 7 Most Banned Picture Books Last Year*, Feb. 22, 2023, *at* https://www.edweek.org/teaching-learning/the-top-7-most-banned-picture-books-last-school-year/2023/02 (last visited September 13, 2023). This Court can take judicial notice of this. *Youdon v. Bd. of Immigration Appeals*, 204 Fed. App'x 89, 91 (2d Cir. 2006) ("This Court may take judicial notice of adjudicative facts, such as current events, that materially bear on an applicant's claim for relief from removal."); *Lazy Y. Ranch, Ltd. v. Wiggins*, 2007 WL 1381805, at *6 (D. Idaho Mar. 13, 2007), *aff'd*, 546 F.3d 580 (9th Cir. 2008) ("Examples of the types of facts that are typically taken judicial notice of include: matters of geography, history, language and word usage, current events, economics; court records and materials in court files; and administrative proceedings or court records in related proceedings involving one or more of the same parties.").

identifiable and constitutionally proscribable conduct that renders [the statute] immune from pre-enforcement facial challenge." (S.A. at 13-14 [internal quotation omitted] [citing *Planned Parenthood*, 7 F.4th at 603-04]). This conclusion was erroneous.

Ms. Smiley certainly does not dispute that some subjects would clearly fall within the statute's prohibition, such as teaching sex education or about sexually transmitted diseases. But as illustrated above, these topics are only a miniscule subset of what might be encompassed by the term "human sexuality," including the topic of "gender identity," which the State agrees is prohibited by the statute. The fact that the statute doubtless covers sex education means only that there is "some conduct that clearly falls within the provision's grasp," *Johnson*, 576 U.S. at 602, a fact that does not render a facial challenge inappropriate or unsuccessful.

The State's own representations below, the statutory text, and common usage all confirm that giving "instruction" on "human sexuality" means more than teaching sex education in the classroom. But what? It simply is not clear.

\*                    \*                    \*

Neither "instruction" or "human sexuality" as contained in the statute provides a discernible core by which Ms. Smiley can guide her actions. As a result, the statute invites arbitrary enforcement, particularly as the Secretary of Education has sole enforcement authority, and no regulations have been promulgated to guide her enforcement. When a proscription is subject to multiple permissible interpretations, it invites arbitrary enforcement. *See, e.g., Cunney v. Bd. of Trustees of Vill. of Grand*

*View, N.Y.*, 660 F.3d 612, 624-25 (2d Cir. 2011) (finding that terms of zoning ordinance that provided the "Village enforcement officers with unfettered latitude in making compliance determinations" rendered the ordinance unconstitutionally vague). "We have a term for laws like th[is]. We call them vague. And '[i]n our constitutional order a vague law is no law at all.'" *Dubin v. United States*, 599 U.S.--, 2023 WL 3872518, *13 (June 8, 2023) (Gorsuch, J., concurring) (quoting *Davis,* 139 S. Ct. at 2323). Indiana Code § 20-30-17-2 is unconstitutionally vague.

II.    Ms. Smiley is likely to succeed in her claim that the statute violates the First Amendment

      A.    A law violates the First Amendment if it is impermissibly vague and overbroad

"Although it derives from the Fourteenth Amendment, a statute that is vague may implicate a plaintiff's First Amendment rights." *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012). "The general test of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620 (1976) (quotation and citation omitted). "When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). This is because "[v]ague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 807 (2011) (cleaned up).  In other words, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Companion to the Fourteenth Amendment's "void-for-vagueness" doctrine is the First Amendment's overbreadth doctrine, which provides that "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). As this Court has noted, "[i]n the First Amendment context, vagueness and overbreadth are two sides of the same coin, and the two sorts of challenge are often conceived of as alternative and often overlapping theories for relief on the same claim." *Cntr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (quotation and citation omitted). Just as in the context of a vague law, "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exercise of ideas." *Id*. A "law's chilling effect is particularly great when it is unclear whether the law actually forbids the contemplated activity." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 847 (7th Cir. 2011) (citation omitted). The central inquiry is whether the challenged statute "potentially reach[es] a 'substantial' amount of protected speech." *Madigan*, 697 F.3d at 479-80.

B.     The statute chills a substantial amount of Ms. Smiley's protected speech

The district court concluded that all, or nearly all, of Ms. Smiley's speech was the speech of her employer and therefore not protected by the First Amendment. (S.A. at 12). This conclusion is erroneous and is directly contradicted by the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, -- U.S. --, 142 S. Ct. 2407 (2022).

When a teacher is delivering a prescribed lesson to a class of attentive students, she is engaging not in private expressive activity, but rather in the speech

of her employer; two of this Court's decisions, heavily relied upon by the district court, establish as much. *See Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 715-16 (7th Cir. 2016) (speech by teacher during grammar lesson was employer's speech); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (teacher's speech during current-events lesson, expressing a viewpoint on the United States' military involvement in Iraq that departed from approved curriculum, was employer's speech). Ms. Smiley does not dispute this obvious proposition.

In *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969), the Supreme Court stressed that the First Amendment protects both teachers and students within the school setting, neither of whom "shed their constitutional right to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. Neither this Court, nor the Supreme Court, has concluded that every expressive activity undertaken by a teacher on school grounds, or while conducting school-related activities, constitutes the speech of her employer, and clearly it does not. But the Supreme Court has long since concluded that an employee's on-duty speech may be private. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 383-92 (1987). The Supreme Court's recent decision in *Kennedy* confirms this in the context of public school employees, and the district court's contrary conclusion is erroneous.

In *Kennedy*, the school employee—a high school football coach—would routinely kneel at the 50-yard line of the football field to pray following the conclusion of games. 142 S. Ct. at 2416. Sometimes he would do so alone, and sometimes he would be joined in prayer by many of the student-athletes. *Id.* The school district

ultimately instructed the coach to end this practice, concerned that it constituted the school district's own speech, potentially violating the Establishment Clause of the First Amendment. *Id.* at 2418.

Faced with the question of whether the coach's prayer activity constituted private speech or that of his employer, the Supreme Court concluded that the speech was private. *Id.* This was so even though the coach engaged in this speech during a time and at a place when his employment duties specifically required him to be actively engaged in the supervision his students, during a school-sponsored activity, in a place that he could access only because of his official position as a coach:

> [H]is job description required him to "accompany and direct" all home and out-of-town games to which he was assigned, overseeing preparation and transportation before games, being "responsible for player behavior both on and off the field," supervising dressing rooms, and "securing all facilities at the close of each practice." His duties encompassed "supervising student activities immediately following the completion of the game" until the students were released to their parents or otherwise allowed to leave.

*Id.* at 2435 (Sotomayor, J. dissenting) (internal citation omitted). This was so, said the Court in its majority opinion, because "he was not seeking to convey a government-created message" and did so during a time when coaches could find a "private moment," for example, to call home or socialize. *Id.* at 2424-25.

In so holding, the Supreme Court expressly rejected the school district's emphasis on the speech's on-duty timing, its location permitted only by the employee's role as coach, and the fact that the coach "served as a role model clothed with the mantle of one who imparts knowledge and wisdom" who was often joined by his students in prayer. *Id.* at 2425.  The Court cautioned that defining the employee's

[27]

role so broadly as to include this speech commits the error of "treating everything teachers and coaches say in the workplace as government speech subject to government control." *Id.* The Supreme Court cautioned that such a broad conception of employee speech would mean that "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Id.*

The district court's view of teacher speech is precisely the one rejected by the Supreme Court in *Kennedy*, and its conclusion that all of Ms. Smiley's speech is that of her employer is erroneous.[4] (*See* S.A. at 6-10). The speech at issue here is precisely the type previewed by the Supreme Court as private. As to Ms. Smiley's informal, non-curricular interactions with students, the district court concluded that those were all part and parcel of Ms. Smiley's official duties, as they create "teachable moments" for the youth. (S.A. at 8-9). But this is the same rationale the Supreme Court held unpersuasive in *Kennedy* when it rejected the notion that a teacher, whenever on duty, is a role model "clothed with the mantle of one who imparts knowledge and wisdom," thereby rendering his or her every word that of an employer. *Kennedy*, 142 S. Ct. at 2425.

In addition to informal interactions, the district court specifically pointed to Ms. Smiley's water bottle, classroom library, and car bumper stickers as "within the scope of Ms. Smiley's duties and responsibilities as an elementary school teacher and

---

[4]     The district court left open the possibility that the bumper stickers might be considered private speech, but concluded, for reasons discussed above that a preliminary injunction was nonetheless unwarranted. (S.A. at 10).

therefore not protected by the First Amendment." (S.A. at 9). But again, *Kennedy* forecloses this conclusion: under the district court's formulation, if Ms. Smiley placed a sticker on her water bottle that carried a religious message, this would be the speech of her employer. *Kennedy* confirms that this cannot be the case. Ms. Smiley is "not seeking to convey a government-created message," *Kennedy,* 142 S. Ct. at 2424, and just like the Supreme Court's hypothesized teacher wearing a headscarf, or *Kennedy*'s football coach, Ms. Smiley privately speaks within the school setting.

As noted above, in *Edelblut*, the court denied the State's motion to dismiss a challenge to the state statute that prohibited New Hampshire public primary and secondary school students from being "taught, instructed, inculcated or compelled to express belief in, or support for" various concepts concerning "age, sex, gender, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin." 2023 WL 171392, at *1. The court noted that because the challenged statutory provisions were "susceptible to an interpretation that encompasses extracurricular speech, they plausibly restrict teachers' speech as private citizen." *Id.* at *7. Indiana Code § 20-30-17-2 restricts Ms. Smiley's private speech.

In the face of all this, Ms. Smiley is required to change her expressive activities to avoid running afoul of the statutory prohibition and risk actions against her teaching license. She will not carry her water bottle, which is essentially a billboard expressing her personal views. She may have to forego replacing her expressive bumper stickers on her new car. She will alter the way that she communicates with

students in their informal, non-lesson-based interactions, and she may be required to remove books from her classroom library. In short, she is being forced to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown*, 564 U.S. at 786 (cleaned up). This chill is both real and substantial.

C.     The statute's chilling effect is unreasonable

To be sure, not all personal speech of government employees is constitutionally protected. As originally described in *Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006), and *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 568-73 (1968), when an employee speaks as a citizen addressing a matter of public concern, the Supreme Court has indicated that a court's next step ordinarily should be balancing the "competing interests surrounding the speech and its consequences," *Kennedy*, 142 S. Ct. at 2423. That speech is subject to First Amendment protection (1) if it addresses a matter of public concern; and (2) if the employee's interest in "expressing that speech [is] not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (quotation and citation omitted). This is commonly referred to as *Pickering* balancing.

If the government regulation at issue is a form of prior restraint—that is, a prospective prohibition on speech not yet uttered, rather than a post hoc employment decision, an additional weight is added to the balance, specifically in favor of the speech. Prior restraints are the most disfavored forms of restrictions on speech, as a prospective restriction "chills potential speech before it happens, depriving the public of information that might otherwise be disseminated." *Wernsing v. Thompson*, 423

F.3d at 732, 747 (7th Cir. 2005) (citing *NTEU,* 513 U.S. at 468) (internal quotation omitted). In this prior-restraint context, the Government must show that the interests of both the "vast group of present and future employees in a broad range of present and future expression," and of their potential audiences in hearing that expression, "are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). Indiana Code § 20-30-17-2 is a form of prior restraint, as it prohibits in advance an entire category of speech. *See, e.g., Berg v. Health & Hosp. Corp. of Marion Cnty., Ind.*, 865 F.2d 797, 801 (7th Cir. 1989) ("Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated.").

The district court did not conduct this analysis, having concluded that the statute did not reach a substantial amount of protected speech. (S.A. at 12). As described, above, that conclusion is foreclosed by *Kennedy*, and Ms. Smiley's private speech is implicated by the statute.

There can be little doubt that the speech at issue addresses matters of public concern: family relationships, LGBTQ rights, and AIDS advocacy, for example, all certainly command the public's interest and attention, and "[s]peech is of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

The only remaining question, therefore, is whether such a chill is reasonable. It is not. A thumb is already on the scale in favor of Ms. Smiley's speech, as this statute constitutes a prior restraint. Ms. Smiley is not engaging in expression that is antithetical to or disruptive of the educational mission of her employer, and the State has not contended otherwise. Therefore, her speech cannot be suppressed or chilled.

The balance weighs heavily in Ms. Smiley's favor, and against the constitutionality of the statute. Ms. Smiley is likely to succeed in showing that the State cannot meet its burden under this particularly stringent form of balancing.

III.    The other requirements for the grant of a preliminary injunction are met[5]

Having erroneously found that Ms. Smiley was not likely to succeed on the merits of her claims, the district court did not determine whether the other requirements for the grant of a preliminary injunction were met. (S.A. at 15 n.7). The other factors are satisfied, and a preliminary injunction should issue.

A.    Ms. Smiley is faced with irreparable harm for which there is no adequate remedy at law

Ms. Smiley is faced with the loss of her license and the ability to do the job she loves if she violates the vague and uncertain terms of the statute. This is irreparable harm. *See, e.g., Fine Foods, Inc. v. U.S. Dep't of Agric.*, 274 F.3d 1137, 1139-40 (7th Cir. 2001) (loss of a license that would put plaintiff out of business is irreparable harm). Moreover, Ms. Smiley's First Amendment and due process rights are being threatened. "[T]he loss of First Amendment freedoms, even for minimal periods of

---

[5]    The State did not dispute below the propriety of any injunction being issued without bond, so Ms. Smiley does not further address this here.

time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). More generally, "[c]ourts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

This Court has stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Similarly, money damages are not sufficient to rectify the irreparable injury that Ms. Smiley faces.

B.     The balance of harms favors Ms. Smiley

In *Christian Legal Society*, this Court held that a governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *See* 453 F.3d at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true here. Granting a preliminary injunction so that the status quo is maintained will avoid a threat to constitutional rights and will not burden the State.

C.     The public interest will not be disserved by the grant of a preliminary injunction

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. The same is true of protecting Ms. Smiley's due process rights,

[33]

as "[e]nforcing a constitutional right is in the public interest." *Whole Woman's Health Alliance v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019).

## CONCLUSION

The district court erred in finding that Ms. Smiley is not likely to prevail on the merits of her claims. The denial of the preliminary-injunction request should be reversed, and this case should be remanded to the district court with instructions that it issue an injunction against the enforcement of Indiana Code § 20-30-17.

Stevie J. Pactor
Counsel of Record
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org


Attorneys for Appellant

**Certificate of Compliance**

I hereby certify that this brief conforms to Circuit Rule 32.

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 9,297 words based on the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the body of the brief and 11-point font for footnotes.

<u>/s/ Stevie J. Pactor</u>

Attorney at Law

**Certificate of Service**

I hereby certify that on the 18th day of September, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

/s/ Stevie J. Pactor

Attorney at Law

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KAYLA SMILEY,                          )
                                       )
                    Plaintiff,         )
                                       )
           v.                          )      No. 1:23-cv-01001-JPH-MKK
                                       )
DR. KATIE JENNER,                      )
                                       )
                    Defendant.         )

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

A new Indiana law prohibits public schools and their employees from providing instruction to students in prekindergarten through grade 3 on human sexuality.  Kayla Smiley—a teacher who works for the Indianapolis Public Schools—alleges that the new law violates the United States Constitution because it (1) infringes on her right to free speech and (2) is so vague that she does not know what speech and actions may violate the law. She therefore asks the Court to enter a preliminary injunction preventing enforcement of the new law.  Because Ms. Smiley has not shown some likelihood of succeeding on the merits of her claims, that motion is **DENIED**. Dkt. [9].

# I.
## Facts & Background[1]

House Enrolled Act 1608 went into effect on July 1, 2023, and the relevant provisions have been codified at Indiana Code chapter 20-30-17.[2] Under HEA 1608, "[a] school, an employee or staff member of a school, or a third party vendor used by a school to provide instruction may not provide any instruction to a student in prekindergarten through grade 3 on human sexuality."  Ind. Code § 20-30-17-2.[3]  But "[n]othing" in HEA 1608 "may be construed to prevent a school employee or a school staff member from responding to a question from a student regarding" human sexuality.  *Id.* § 20-30-17-4.

Kayla Smiley is a teacher who will be subject to HEA 1608 when she begins teaching an Indianapolis Public School class of first through third graders on July 31, 2023.  Dkt. 20-1 at 1.  She brought this action against the Indiana Secretary of Education, Dr. Katie Jenner, as head of the department overseeing teacher licensing.  Dkt. 1 at 2–3.  Ms. Smiley is concerned that she may unwittingly violate HEA 1608, thereby jeopardizing her teaching license, because she has "no idea what is encompassed within the term 'human

---

[1] By agreement of the parties, there has been limited discovery and no evidentiary hearing.  *See* dkt. 18; dkt. 19.  The Court therefore bases these facts on the written record, including the complaint and designated evidence.

[2] HEA 1608 also included an unrelated parental-notification provision; references to HEA 1608 in this order are limited to the prohibition on instruction on human sexuality.

[3] Under HEA 1608, "school" includes public schools, including charter schools; laboratory schools, the Indiana School for the Blind and Visually Impaired, and the Indiana School for the Deaf.  Ind. Code § 20-30-17-1.

sexuality,'" and does "not understand what is meant by the statute's term 'instruction.'"  Dkt. 20-1 at 2.  For example, she does not know if having books in her classroom library that "touch on LGBTQ themes" and "discuss and represent different family relationships and structures" violates HEA 1608.  *Id.* at 3; *see* dkt. 26-1 at 19–26 (Smiley Dep. at 65–96).  She contends that she would also "have to censor" herself by (1) not carrying her water bottle with its "message about tolerance of persons who are LGBTQ," (2) "remov[ing] the LGBTQ-supportive bumper stickers" that will be on her car, and (3) refraining from talking with students about "using the word 'gay' pejoratively.'"  Dkt. 20-1 at 8–9.

Ms. Smiley therefore alleges that HEA 1608 is facially unconstitutional because it violates (1) the Fourteenth Amendment because it's too vague and (2) the First Amendment by restricting her speech.  *Id.* at 9–10.  She seeks a preliminary injunction under Federal Rule of Civil Procedure 65 prohibiting the enforcement of HEA 1608.  Dkt. 9 at 2.

## II.
## Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021).  To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing.  *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Id.* "If these threshold factors are met, the court proceeds to a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

### III.
### Analysis

The Court's analysis begins and ends with one of the threshold requirements for obtaining a preliminary injunction—whether Ms. Smiley has shown some likelihood of succeeding on the merits of her claims.

### A. First Amendment

Ms. Smiley argues that HEA 1608 is facially unconstitutional because it imposes "a significant burden on a substantial amount of Ms. Smiley's speech."

Dkt. 21 at 18–28.[4]  The Secretary responds that HEA 1608 "does not reach *any* protected speech" and that even if it did, it is not unconstitutional on its face. Dkt. 27 at 10, 23–24.  In making those arguments, the parties primarily dispute whether HEA 1608's language covers informal expression, like Ms. Smiley's "classroom library, the lessons on her water bottle or vehicle, or conversations that she has with students between classes or before or after school." Dkt. 29 at 13–14; *see* dkt. 27 at 10–18.  However, "[a] federal district judge cannot definitively interpret" HEA 1608 as "the state judiciary can." *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 541 (7th Cir. 2019).  The Court therefore resolves the preliminary-injunction motion under the First Amendment precedents that both parties cite, without deciding HEA 1608's scope.

The "First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  That does not mean, however, that "the speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish." *Id.*  "In addition to being private citizens, teachers . . . are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.*

---

[4] While Ms. Smiley argues her Fourteenth Amendment vagueness claim first, that facial challenge is "disfavored" when the First Amendment is not implicated, *see Planned Parenthood of Ind. & Ky. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 603 (7th Cir. 2021), so the Court begins its analysis with the First Amendment claim.

So, when a public school teacher brings a First Amendment claim, the first question "involves a threshold inquiry into the nature of the speech at issue." *Id.* "If a public employee speaks 'pursuant to [her] official duties,'" that speech is, for constitutional purposes, "the government's own speech." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). In that situation, the First Amendment does "not shield the individual from an employer's control and discipline." *Id.*; *Brown v. Chi. Bd. Of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (If a teacher "is not wearing her hat 'as a citizen,' or if she is not speaking 'on a matter of public concern,' then the First Amendment does not protect her.").

Here, Ms. Smiley faces a heavy burden to show that HEA 1608 is unconstitutional on its face, rather than as applied to specific speech. *See* dkt. 21 at 19. "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023). "Because it destroys some good along with the bad, invalidation for overbreadth is 'strong medicine' that is not to be casually employed." *Id.* In short, enjoining the enforcement of a law in its entirety, as Ms. Smiley seeks, is "only a last resort." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012).

The First Amendment does not require that "last resort" here. To start, in-classroom speech is "not the speech of a 'citizen' for First Amendment purposes" and therefore "does not implicate . . . First Amendment rights."

*Brown*, 824 F.3d at 715 (citing *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007)); *see Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 892 (7th Cir. 2023) ("The district court correctly held that when Kluge was addressing students in the classroom, his speech was not protected by the First Amendment.").  So, in *Brown*, a teacher's First Amendment claim "fail[ed] right out of the gate" when he challenged his suspension for "a well-intentioned but poorly executed discussion of why [racial epithets] are hurtful and must not be used" that he led "in the course of his regular grammar lesson to a sixth grade class."  *Brown*, 824 F.3d at 715.  And in *Mayer*, an elementary teacher had no First Amendment right to share her personal views on military operations in Iraq during a "current-events session, conducted during class hours."  474 F.3d at 479.

*Brown* and *Mayer* also show that speech within the scope of a teacher's job duties isn't limited to speech that presents "official curriculum."  *Brown*, 824 F.3d at 715 ("That [Brown] deviated from the official curriculum does not change [the] fact" that his speech was "pursuant to his official duties.").  The teacher's speech in *Brown* was spontaneous and in response to discovering students' notes that included racial slurs.  *Id.* at 714.  What's more, the teacher's speech "appear[ed] to have been well-intentioned," explaining to the students why racial epithets are hurtful and must not be used.  *Id.*  In *Mayer*, the teacher's speech, which reflected a specific political position, was made in response to a student's question.  474 F.3d at 478.  The Seventh Circuit nevertheless held that the First Amendment was not implicated in either

situation, because "[t]he Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Mayer*, 474 F.3d at 480.

This principle applies with equal force to speech outside of the classroom. As the Supreme Court has explained, the "'critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Kennedy*, 142 S. Ct. at 2424 (determining whether speech is within the scope of an employee's duties "should be undertaken 'practial[ly]'"). That's especially important here, in the elementary-education context, where much of what an elementary teacher says to students during a typical school day is spontaneous (as in *Brown*), in response to questions (as in *Mayer*), or otherwise outside of a formal lesson plan. *See id.* Instead of being outside an elementary teacher's official duties, those things are central to the job. And the students are not any less of a captive audience when having an informal conversation with their teacher in a hallway or choosing which of the teacher's books to look at during unstructured time.

Indeed, Ms. Smiley wants to use classroom-library books, water bottle messages, and car bumper stickers to "create teachable moments" for her students. Dkt. 1 at 4. She "carries her water bottle to instruct those who observe it on tolerance of persons who are LGBTQ." *Id.* at 8. She puts bumper stickers on her car to similarly "express . . . tolerance." Dkt. 26-1 at 30 (Smiley Dep. at 111). And she has chosen the books in her library to ensure that students have "a whole, full-circle world view where they could be open-minded

of other cultures" and "learn about the history of some . . . hot topic" issues. *Id.* at 18, 20 (Smiley Dep. at 63, 69). In short, according to Ms. Smiley, "everything sparks conversation" and "it is always used as a teachable moment." *Id.* at 30 (Smiley Dep. at 112). Such interactions, even when spontaneous and not part of official curriculum, are within the scope of Ms. Smiley's duties and responsibilities as an elementary school teacher and therefore not protected by the First Amendment. *Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.").

Ms. Smiley is therefore unlikely to be able to show that the First Amendment protects the speech that she is concerned may subject her to discipline. *See Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 411 (7th Cir. 1994); *accord Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) (Sutton, J.) (explaining that a teacher's "pedagogical choices" are unprotected because they are "speech 'pursuant to' the claimant's official duties" under *Garcetti*).

The Supreme Court's *Kennedy* opinion, which Ms. Smiley relies on, does not support Ms. Smiley's position. 142 S. Ct. at 2407. There, the Court held that a high school football coach spoke as a private citizen when he prayed on the field after a few games. *Id.* at 2424. That was because the prayers were not in the scope of his coaching duties, were at a time when coaches were "free to engage in all manner of private speech," and were "when students were

engaged in other activities."  *Id.* at 2424–25.  As the Court observed, "what matters is whether Mr. Kennedy offered his prayers while acting within the scope of his duties as a coach.  And taken together, both the substance of Mr. Kennedy's speech and the circumstances surrounding it point to the conclusion that he did not."  *Id.* at 2425.

Here, by contrast, most if not all of the expression that Ms. Smiley fears could violate HEA 1608 is aimed at "teachable moment[s]" to impart specific lessons to elementary students.  Dkt. 26-1 at 30 (Smiley Dep. at 112).  There's therefore no indication that Ms. Smiley would be "stepp[ing] outside" her role as a teacher "to speak as a citizen."  *Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010).  On the contrary, the situations that Ms. Smiley describes seem to be squarely within her job as an elementary school teacher. *Garcetti*, 547 U.S. at 422 ("When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.").  Indeed, Ms. Smiley cites no authority establishing that an elementary school teacher has the right to speak in her capacity as a private citizen when expressing an educational message to her students.

At the least, even if some of the expression that Ms. Smiley is worried about—perhaps the LGBTQ-supportive bumper stickers on her car—is protected by the First Amendment, Ms. Smiley is nonetheless unlikely to be able to show that HEA 1608 is unconstitutional on its face.  *See Bell v. Keating*, 697 F.3d 445, 456 (7th Cir. 2012) ("Facial invalidation for technical overbreadth is strong medicine, and is inappropriately employed unless the

statute substantially criminalizes or suppresses otherwise protected speech vis-à-vis its plainly legitimate sweep.").  In short, Ms. Smiley asks for an injunction that would "throw out too much of the good based on a speculative shot at the bad."  *Hansen*, 143 S. Ct. at 1948.  "That is not the stuff of overbreadth—as-applied challenges can take it from here."  *Id.*[5]

To be clear, the Court does not suggest that Ms. Smiley forfeited her First Amendment rights when she became a public school teacher.  *See Garcetti*, 547 U.S. at 421.  On the contrary, teachers are "the members of a community most likely to have informed and definite opinions" about issues of public concern related to education, so it's "essential that they be able to speak out freely on such questions" to the public.  *Id.*  That's why in *Pickering*, where the relevant speech was a teacher's letter to a local newspaper addressing issues including the school board's funding policies, the Supreme Court held that the school administration could not "'limit[ ] teachers' opportunities to contribute to public debate.'"  *Garcetti*, 547 U.S. at 419 (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 573 (1968)).  But here, HEA 1608's prohibition of "instruction . . . on human sexuality" affects only expression to elementary students—rather than to the public—which the First Amendment does not protect when it's "against the instructions of elected officials."  *Mayer*, 474 F.3d at 480.

---

[5] Because Ms. Smiley brings only a facial challenge, the Court does not address her likelihood of success on any as-applied challenge.

Without a substantial effect on protected speech, Ms. Smiley is unlikely to succeed on her claim that HEA 1608—on its face—violates the First Amendment.

### B. Fourteenth Amendment

Ms. Smiley argues that HEA 1608 is unconstitutionally vague under the Fourteenth Amendment because the terms "human sexuality" and "instruction" do not give fair notice of "what she may say and where she may say it." Dkt. 21 at 17. The Secretary responds that HEA 1608 is not too vague because it has "a substantial, understandable core." Dkt. 27 at 18.

"The void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). "[A] statute is only unconstitutionally vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Id.* In short, due process "does not demand perfect clarity and precise guidance." *Id.*

Because Ms. Smiley has not shown some likelihood of success on her First Amendment claim, her facial vagueness challenge is "limited" and "disfavored." *Planned Parenthood of Ind. & Ky. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 603 (7th Cir. 2021) ("The Supreme Court has repeatedly stated that facial invalidation of legislation is disfavored."). HEA 1608 is therefore unconstitutional on its face only if it "has no discernable core" of

understandable meaning and "lacks any ascertainable standard." *Id.* at 603–04; *see Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019).

Here, "instruction . . . on human sexuality" is not so vague that it lacks a core of understandable meaning. Those terms are no vaguer than "acquires," "receives," or "transfers," all of which the Seventh Circuit has held to be understandable. *Trs. of Ind. Univ.*, 918 F.3d at 540. And they are certainly more definite than "reasonable," which also "has enough of a core to allow its use in situations where rights to speak are at issue." *Id.* Like each of those terms, "instruction" and "human sexuality" are terms that people "use and understand in normal life." *Id.* So Ms. Smiley has not been given "no guidepost" from which to "divine what sort of conduct is prohibited." *Planned Parenthood of Ind. & Ky.*, 7 F.4th at 603.

Indeed, Ms. Smiley admits that HEA 1608 legitimately applies to at least formal teaching on sex education or sexually transmitted diseases. Dkt. 21 at 10; dkt. 29 at 9. She argues that those things don't qualify as a "core" to the statute because "there is no official course on 'human sexuality' taught to students in kindergarten through third grade." Dkt. 21 at 16. But that doesn't remove the possibility that a teacher could insert human sexuality into a lesson plan on their own, and it does not make the prohibition less understandable. *See Planned Parenthood of Ind. & Ky.*, 7 F.4th at 604 (finding an understandable core centered on situations that "almost never occur"). Those "clear-cut cases" are therefore a "core of easily identifiable and

constitutionally proscribable conduct" that "renders [HEA 1608] immune from this pre-enforcement facial challenge." *Id.* at 603–04.

Ms. Smiley worries that her classroom-library books, water bottle messages, car bumper stickers, and passing conversations with students may unwittingly violate HEA 1608. *See* dkt. 21 at 4–12. But even if there are questions about whether these actions and expressions come within HEA 1608's scope, they do not undermine or remove HEA 1608's understandable core. *See Planned Parenthood of Ind. & Ky.*, 7 F.4th at 605 ("The enforcement of the Statute will inevitably present many uncertainties at the margins, but the resolution of those 'edge questions' arising from the enforcement of a state law is a principal role of the state's courts.").

Nor does Ms. Smiley argue that she could not bring an as-applied challenge if the Department of Education were to initiate proceedings to suspend or revoke her teaching license. *See Trs. of Ind. Univ.*, 918 F.3d at 541 ("When a statute is accompanied by a system that can flesh out details, the due process clause permits those details to be left to that system."). That is the appropriate way to raise constitutional concerns about the periphery of a statute's application. *See id.* ("[A] core of meaning is enough to reject a vagueness challenge, leaving to future adjudication the inevitable questions at the statutory margin."). So while "an as-applied challenge to [HEA 1608] may have a different outcome, *this* challenge to the Statute fails because it is a

facial challenge to a statute with a discernable core." *Planned Parenthood of Ind. & Ky.*, 7 F.4th at 604.[6]

Ms. Smiley therefore has not shown some likelihood of success on her due process claim.[7]

## IV.
## Conclusion

Ms. Smiley has not shown some likelihood of success on her First Amendment claim or on her Fourteenth Amendment claim.  Her motion for preliminary injunction is therefore **DENIED**.  Dkt. [9]. The Secretary's motion to strike is **DENIED** because the challenged evidence would not affect the outcome of the motion for preliminary injunction.  Dkt. [25].

**SO ORDERED.**

Date: 7/28/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

---

[6] To support her argument, Ms. Smiley relies on examples of Indiana lawmakers who, in debating HEA 1608, were uncertain about how it may apply in some situations. *See* dkt. 21 at 7–10.  The Secretary has moved to strike that evidence, arguing that it does "not meet the statutory requirements to be considered Indiana legislative history or evidence of the meaning of the law."  Dkt. [25].  Because the cited examples go to the statute's "margins" rather than its "core," *see Marion Cnty. Prosecutor*, 7 F.4th at 605, the motion to strike is **DENIED** as unnecessary to resolve this facial challenge.

[7] Because Ms. Smiley has not shown some likelihood of success on the merits justifying a preliminary injunction, the Court does not consider the other preliminary injunction factors.  *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998).

STATEMENT OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) are included within the appendix. There are no materials within the scope of Circuit Rule 30(b).

/s/ *Stevie J. Pactor*
Stevie J. Pactor
Attorney at Law