In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-2543

KAYLA SMILEY,

*Plaintiff-Appellant*,

*v.*

KATIE JENNER,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis Division.
No. 1:23-cv-01001-JPH-MKK — **James P. Hanlon,** *Judge*.

_____

ARGUED FEBRUARY 23, 2024 — DECIDED APRIL 21, 2026

_____

Before SCUDDER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In 2023, Kayla Smiley was due to begin teaching grades 1–3 in the Indianapolis Public School system when Indiana enacted a statute prohibiting public schools and their teachers from providing "instruction" on "human sexuality" to students in prekindergarten through third grade. Ms. Smiley invoked 42 U.S.C. § 1983 and challenged the measure as facially overbroad and vague in

violation of the First and Fourteenth Amendments. She asked the district court to declare the curriculum limitation unconstitutional and to enjoin its enforcement. Because Ms. Smiley has failed to show a likelihood of success on the merits, we affirm the district court's denial of a preliminary injunction.

## I

### A

Indiana law establishes curriculum requirements for certain schools within the state. See Ind. Code § 20-30-1-1 *et seq.*, 20-30-17-1. In 2023, the state General Assembly passed Indiana House Enrolled Act 1608, which added a new curriculum limitation:

> A school, an employee or staff member of a school, or a third party vendor used by a school to provide instruction may not provide any instruction to a student in prekindergarten through grade 3 on human sexuality.

*Id.* § 20-30-17-2.

By its terms, HEA 1608 allows teachers to "respond[] to a question from a student" on human sexuality. *Id.* § 20-30-17-4. It also permits teachers to instruct on academic standards "developed by the department [of education]" on enumerated subjects (such as science and math) and to provide required instruction on child abuse and child sexual abuse notwithstanding the restriction imposed by the curriculum limitation. See *id.* § 20-30-17-3; see also *id.* §§ 20-31-3-2, 20-30-5-5.7. But the General Assembly otherwise left the terms "instruction" and "human sexuality" undefined.

No. 23-2543    3

The Indiana Department of Education administers state licensing standards for teachers. On the recommendation of the Secretary of Education, the Department may suspend or revoke a teacher's license for: "(1) immorality; (2) misconduct in office; (3) incompetency; or (4) willful neglect of duty." *Id.* § 20-28-5-7. Indiana law also permits a teacher to challenge a licensing action in an administrative process. See *id.* §§ 20-28-5-7, 4-21.5-3-1 *et seq.*

Kayla Smiley filed this action in federal court in Indianapolis in June 2023, a month before HEA 1608 was set to go into effect and shortly before she would begin teaching grades 1–3 in the 2023–2024 school year. Ms. Smiley alleges that Section 20-30-17-2 will capture, or at least chill, protected speech that she primarily wishes to engage in while serving as an elementary school teacher. She points to some specific examples of speech, such as the choice to include books in her classroom library that touch on topics of parenting, and gender and sexual identity, to place stickers on her water bottle and car communicating pro-LGBTQ+ messages, and to correct students when they use pejorative terms related to sexual identity.

Ms. Smiley also contends that HEA 1608's prohibition on "instruction" on "human sexuality" is unconstitutionally vague. She worries that, with no discernable boundaries as to what constitutes "instruction" or "human sexuality," she may unintentionally run afoul of the statute and risk losing her teaching license.

B

The district court declined to enjoin Section 20-30-17-2 because Ms. Smiley failed to show a likelihood of success on

either her First or Fourteenth Amendment claims. As to the former, the court concluded that she did not identify much, if any, speech protected by the First Amendment to which the curriculum limitation applies. The district court reasoned that an elementary school teacher's official speech, which receives no First Amendment protection, includes classroom instruction as well as communications that Ms. Smiley intends to engage in elsewhere on school grounds, "even when spontaneous and not part of official curriculum," because she wants to use it to create "teachable moments."

In reaching this conclusion, the district court highlighted the elementary school context where many interactions between students and teachers occur outside of a formal lesson plan and yet are central to a teacher's role. The district court also determined that even if Section 20-30-17-2 encroaches on some protected speech, the limitation is not enough to sustain an overbreadth challenge.

The district court further determined that "instruction … on human sexuality" is not unconstitutionally vague because both "instruction" and "human sexuality" contain a discernable core of meaning. Largely identifying that core herself, Ms. Smiley acknowledged that "instruction" includes formal classroom instruction and that "human sexuality" at least encompasses sex education and the provision of information on sexually transmitted diseases. The district court emphasized that "edge questions" about the scope of Section 20-30-17-2 do not undermine the statute's core meaning and should be resolved on an as-applied basis, not facially in a pre-enforcement challenge.

Ms. Smiley appealed.

**II**

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such relief, a plaintiff bears the heavy burden of showing that she is likely to succeed on the merits, suffer irreparable harm absent preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest. See *id.* at 20.

In reviewing a district court's grant or denial of a preliminary injunction, we review its legal conclusions without deference, its factual findings for clear error, and its balancing of harms for abuse of discretion. See *Richwine v. Matuszak*, 148 F.4th 942, 952 (7th Cir. 2025). "Absent such errors, we afford a district court's decision great deference." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sep. 4, 2020) (cleaned up).

Ms. Smiley is represented by very able counsel, and the essence of her challenge to HEA 1608 is clear. She contends that Section 20-30-17-2 lacks a discernable core of meaning and will thereby discourage her from engaging in protected speech or cause her to violate the statute unwittingly and risk losing her teaching license. From this foundation, Ms. Smiley advances two related claims—a First Amendment overbreadth claim and a Fourteenth Amendment vagueness claim. Her vagueness claim, in turn, has two components. First, she sees the statute as too vague for the average layperson to understand its limitations. Second, she contends that Section 20-30-17-2 has no standard for enforcement, opening the door to arbitrary and discriminatory licensing actions by the Indiana Department of Education.

The posture of Ms. Smiley's claims complicates her burden. She elected to bring a facial challenge to a state law before Indiana or its courts had a chance to implement or interpret it. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); see also *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 506 (7th Cir. 2024) ("[S]weeping pre-enforcement facial invalidation of law is highly disfavored …. [E]specially so where … the relief sought implicates a local policy and weighty principles of federalism."). Among other concerns, facial challenges risk premature interpretation of a statute based upon speculative facts. See *Moody*, 603 U.S. at 723. They also "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008)). The Supreme Court has consequently set a high bar for facial invalidation, though "[i]n First Amendment cases … th[e] Court has lowered that very high bar" slightly. *Id.* Nevertheless, we agree with the district court that Ms. Smiley has not met it.

A

We begin with the legal framework for a First Amendment overbreadth claim and a Fourteenth Amendment vagueness claim brought in a facial context.

A facial challenge typically requires a plaintiff to show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The overbreadth doctrine relaxes this standard in the First Amendment context. To "provide[] breathing room for free expression," a statute is facially invalid on overbreadth grounds if it "'prohibits a substantial amount of protected

speech' relative to its 'plainly legitimate sweep'" despite having some constitutional applications. *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). Any unconstitutional application that a plaintiff hypothesizes, however, must be "realistic, not fanciful." *Id.* at 770; see also *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800–01 (1984) ("'[S]ubstantial overbreadth' is not readily reduced to an exact definition …. [T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court ….").

Our "first task" in reviewing a combined overbreadth and vagueness challenge, as we do here, is to determine whether the curriculum limitation in Section 20-30-17-2 "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). If it does not, the statute is not overbroad. See *id.*

As for vagueness, a law is unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" or would result in "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). If the act reaches no constitutionally protected activity, the statute survives if it has even one valid application, reflecting the traditional *Salerno* standard. See *Flipside*, 455 U.S. at 494–95. Otherwise, when a law regulates speech, it "must meet a higher standard of clarity and precision" to survive a vagueness challenge. *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014). "[P]erfect clarity and precise guidance have never been required." *Williams*, 553 U.S. at 304. Instead, we scrutinize the law closely and ask whether it has an ascertainable core of

meaning. See, *e.g.*, *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (acknowledging a higher standard in the First Amendment context and applying it to a criminal law affecting protected speech); *Brown v. Kemp*, 86 F.4th 745, 772–74 (7th Cir. 2023) (same).

B

Ms. Smiley's overbreadth and vagueness challenges both address the limitation Indiana law imposes on "instruction." If the term is vague, Section 20-30-17-2 risks limiting a wider range of speech and is therefore more likely to be overbroad. See *Flipside*, 455 U.S. at 494 n.6 (observing that "the vagueness of a law affects overbreadth analysis" because "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone'" (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))). So we begin our analysis with the meaning of "instruction."

While the General Assembly did not define "instruction," the term most commonly means "the action, practice, or profession of teaching," *Instruction*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/instruction (last visited Apr. 21, 2026), and "knowledge or authoritative guidance imparted by one person to another," *Instruction*, Oxford English Dictionary Online, https://www.oed.com/dictionary/instruction_n?tab=meaning_and_use#387233 (last visited Apr. 21, 2026). Section 20-30-17-2 resides in Article 30 of the Indiana Code, entitled "Curriculum," which, as its title implies, concerns teacher and school staff interactions with students on school grounds and in connection with academic requirements or school-sanctioned activities. See generally § 20-30-1-1 *et seq*.

Applying this common meaning within its statutory context, we see "instruction" as limited in the main to a teacher's efforts to impart knowledge for a pedagogical purpose. That Section 20-30-17-2 also applies to school staff other than teachers does not convince us that "instruction" is overbroad or vague because, as Ms. Smiley acknowledges, non-teachers provide education to students too. Put most directly, Section 20-30-17-2 at least applies to Pre-K–3 classroom instruction—the delivery of educational lessons and content to students. On this, the parties agree.

The recognition that much Pre-K–3 instruction occurs in the classroom setting brings with it a companion legal point of great adverse consequence for Ms. Smiley's First Amendment challenge. Our law is clear that primary teachers in public schools have only limited speech rights just like other public employees. See *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 716 (7th Cir. 2016) (distinguishing primary and secondary school teachers from university lecturers). Even more, their in-classroom instruction does not enjoy First Amendment protection. See *id.* at 715 ("[I]n-classroom instruction necessarily constitutes 'statements pursuant to [the teacher's] official duties.'" (quoting *Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007))). This is true whether a teacher delivers a formal lesson pursuant to a curriculum mandate or gives a spontaneous lecture. See *id.* (holding that an impromptu in-class lesson on racial epithets during a grammar lesson was made pursuant to a sixth-grade teacher's official duties); *Mayer*, 474 F.3d at 479–80 (holding the same for an elementary school teacher's personal comments on the Iraq War made during a current-events lesson).

Do not overread what we are saying, for we have no doubt that "instruction" within the meaning of Section 20-30-17-2 may include some noncurricular student-teacher interactions outside the classroom—for example, in hallways, on the playground, or in other common school settings. But this observation does not advance Ms. Smiley's overbreadth claim very far because a teacher's official responsibilities extend beyond classroom walls—for example, maintaining order among students is one of a teacher's "most basic duties." *Brown*, 824 F.3d at 715. So Ms. Smiley's anticipated need to "quell student misbehavior" by educating them on the use of pejorative terms related to sexual identity such as "gay" is not protected speech, whether it occurs in a classroom, a hallway, or elsewhere on school grounds. *Id.*

Of course, not everything a teacher says in the public school setting is unprotected. See *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529–31 (2022) (analyzing whether a public high school football coach's prayer on the field qualified as private speech). Nobody, for example, contends that Ms. Smiley cannot share her personal views or address matters of public concern in the teachers' lounge.

But a public employee's private speech, including speech by an elementary school teacher like Ms. Smiley, "may lose constitutional protection if the government's interest in workplace efficiency outweighs the employee's interest in speaking freely." *Hedgepeth v. Britton*, 152 F.4th 789, 795 (7th Cir. 2025); see also *Kennedy*, 597 U.S. at 531 (observing that this second consideration remained after determining that a public employee's speech was private). Indeed, our case law is clear that the Constitution "does not entitle [primary and secondary school] teachers to present personal views to captive

audiences against the instructions of elected officials." *Mayer*, 474 F.3d at 480; see also *Darlingh v. Maddaleni*, 142 F.4th 558, 566–67 (7th Cir. 2025) (observing in the context of an elementary school guidance counselor's First Amendment retaliation claim that a teacher's "inordinate amount of trust and authority" makes the government's interest in a school's educational environment more compelling (cleaned up)).

Ms. Smiley nevertheless urges us to conclude that her provision of select books in her classroom library as well as her display of stickers on her water bottle and car conveying pro-LGBTQ+ messages qualify as private speech under *Kennedy*.

In *Kennedy*, the Supreme Court determined that a public high school football coach spoke as a private citizen on a matter of public concern when he prayed on the field following games. The coach received no compensation to offer prayer, prayed only after his coaching responsibilities ended and he was free to attend to personal matters while the team engaged in other activities, and did not direct his prayer at the team. See *Kennedy*, 597 U.S. at 529–30.

Ms. Smiley's selection of books for her classroom library is easily distinguishable. Unlike the prayers Coach Kennedy led after football games as a private citizen, Ms. Smiley provides classroom books because of her role as a teacher. Even more, the books are expressly directed at, and provided for, her students in the classroom—the quintessential teaching environment. Her choice of classroom books is therefore not protected speech.

The stickers that Ms. Smiley displays on her car and water bottle require a different analysis. Some usages of stickers may qualify as "instruction" under the Indiana statute and as

protected speech. But defining those circumstances need not detain us. Even assuming the statute prohibits some protected speech expressed through stickers on a car or water bottle, these instances are few relative to the plainly legitimate sweep of Section 20-30-17-2 and do not render it overbroad.

As a final point, Ms. Smiley also worries that "instruction" might cover "chance meetings" she has with students outside of school. This concern roots itself in a strained reading of Section 20-30-17-2, for "instruction" is housed within an article of the Indiana Code that exclusively regulates student-teacher interactions that occur on school grounds or in connection with school-sanctioned activities. See generally § 20-30-1-1 *et seq*.

All of this leads us to conclude that Section 20-30-17-2 is not overbroad because it likely does not implicate a substantial amount of protected speech.

## C

Nor can Ms. Smiley prevail on her vagueness claim, even if we accept that Section 20-30-17-2 affects some protected speech.

The Supreme Court has made clear that the Due Process Clause does not require states to legislate with surgical precision. Indeed, the Justices have underscored that it would be a "basic mistake" for a court to declare a statute void for "the mere fact that close cases can be envisioned." *Williams*, 553 U.S. at 305 (rejecting a vagueness challenge to a criminal statute encompassing some First Amendment activity). Indeed, "[c]lose cases can be imagined under virtually any statute." *Id.* at 306; see also *Wash. State Grange*, 552 U.S. at 449–50 ("In determining whether a law is facially invalid, we must be

careful not to … speculate about 'hypothetical' or 'imaginary' cases.").

Our cases emphasize the same point. "A statute need not define every term to survive a vagueness challenge," *Brown*, 824 F.3d at 717, and we will sustain a facial challenge only where the "statute 'simply has no core' and lacks 'any ascertainable standard for inclusion and exclusion,'" *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020) (quoting *United States v. Jones*, 689 F.3d 696, 703 (7th Cir. 2012)); see also *Trustees of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019) ("Some uncertainty at the margins does not condemn a statute."). Put another way, the bar for facially invalidating a statute on vagueness grounds is very high, especially for civil statutes, which receive "greater tolerance … because the consequences of imprecision are qualitatively less severe" than a criminal penalty. *Flipside*, 455 U.S. at 498–99; see also *Planned Parenthood of Ind. & Ky., Inc. v. Marion County Prosecutor*, 7 F.4th 594, 600 (7th Cir. 2021) (same) (collecting cases).

Here too, Ms. Smiley falls short. Not only does the term "instruction" have an ascertainable core of meaning, the handful of examples Ms. Smiley sees as more worrisome—such as her display of pro-LGBTQ+ stickers on her water bottle or the provision of certain books in her classroom library—arise only at the margins compared to the wide swath of situations clearly within the Indiana statute's ambit.

The same is true of Indiana's limitation of instruction on "human sexuality." Ms. Smiley admits that "human sexuality" at least includes sex education and sexually transmitted diseases. And the plain meaning of the term, of course, extends further to cover human sexual anatomy, sexual reproduction, sexual conduct and intimacy, and sexual orientation.

It is also worth underscoring the difference between "instruction" on "human sexuality" and terms that have rendered statutes unconstitutionally vague in the past: "annoying" conduct, "common night walkers," "habitual loafers," and "elaboration" on the "general" nature of a criminal defendant's defense strategy, for instance. See *Coates v. City of Cincinnati*, 402 U.S. 611, 612–14 (1971); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 156 n.1, 162–64, 166–67 (1972); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–49 (1991); see also *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 599–600 (1998) (Scalia, J., concurring) (observing that but for the fact that a statute concerned government funding, the term "artistic excellence" would render it vague). The latter terms are subjective "terms of degree" with "no settled usage or tradition of interpretation in law." *Gentile*, 501 U.S. at 1049. "Instruction" and "human sexuality" are different. Though each term encompasses more than one definition, words with broad meaning are not the same as vague words where, as here, each term has an ascertainable core of meaning. "Resolving edge questions" around that core "is a principal role of the courts." *Curry*, 918 F.3d at 541.

All for good reason. "Condemned to the use of words," the Supreme Court has recognized that "we can never expect" states to legislate with "mathematical certainty." *Grayned*, 408 U.S. at 110. And, if need be, a Pre-K–3 teacher can always turn to Indiana courts for guidance (a point we emphasized in *Curry*, 918 F.3d at 541) or pursue an as-applied challenge in federal or state court to some particular application of the statute. In the final analysis, any vagueness at the statute's periphery will inevitably "be reduced through a process of interpretation." *Id*. (quoting *Bauer v. Shepard*, 620 F.3d 704, 717 (7th Cir. 2010)).

Another observation warrants mention on Ms. Smiley's combined overbreadth and vagueness claim. Where a term that seems to save a state law from a First Amendment challenge (here, "instruction") is also alleged to be unconstitutionally vague, it is prudent to wait for a state court to provide clarity. See *Bauer*, 620 F.3d at 716. This is so even where, as here, the State says it has no immediate plans to provide clarity. Instead of assuming state officials will "take an untenably broad reading [of a statute]," it is "more respectful of our judicial colleagues in Indiana[] to assume that they will act sensibly and resolve the open questions in a way that honors … [First Amendment] rights." *Id.* We emphasized this same principle in *Curry*, 918 F.3d at 541.

### D

In closing, we address one final aspect of Ms. Smiley's Fourteenth Amendment vagueness claim. A statute can be unconstitutionally vague if its implementation would result in "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108.

Drawing on this principle, Ms. Smiley contends that Section 20-30-17-2 lacks any standard for enforcement. At one level, her observation is fair, for Section 20-30-17-2 is silent on enforcement. A separate statute states that Indiana can suspend or revoke a teacher's license for "misconduct" and other broad categories of wrongdoing without much elaboration (although it does establish an adjudicatory process). See §§ 20-28-5-7, 4-21.5-3-1 *et seq*.

But the core meaning we see in Section 20-30-17-2's curriculum limitation makes arbitrary or discriminatory enforcement unlikely. Nor does Ms. Smiley cast any doubt on the

State's representation that licensing actions are rare and virtually non-existent for curriculum-related violations. In short, we do not "assume" that Indiana will enforce the statute improperly or "take no further steps to minimize the dangers of arbitrary enforcement." *Planned Parenthood*, 7 F.4th at 605 (quoting *Flipside*, 455 U.S. at 504). If that proves inaccurate, Ms. Smiley (or another affected party), may bring an as-applied challenge.

### III

Much of our reasoning today follows from the fact that Ms. Smiley brought facial and pre-enforcement challenges. Settled law counsels us to tread carefully when reviewing a state law in this posture. This is especially true in the context of primary education where states have historically exercised great discretion. See *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 58 (1973) ("The consideration and initiation of fundamental reforms with respect to … education are matters reserved for the legislative processes of the various States ….").

Against this backdrop, Ms. Smiley has not shown that Section 20-30-17-2 is likely overbroad or vague, leaving us to AFFIRM the judgment of the district court.